E. R. BLAIR v. VILLAGE OF COLERAINE AND ANOTHER.[1]

May 3, 1929.

No. 27,249.

[1]Reported in 225 N. W. 284.

R. A. *McOuat,* for relator.

J. F. *Boyles,* for respondent village and United States Fidelity & Guaranty Company, its insurer.

HILTON, J.

Certiorari on the relation of E. R. Blair to review an order of the industrial commission denying him compensation under the workmen's compensation act for a cerebral hemorrhage caused by a ruptured blood vessel and resulting in a paralytic condition.

Relator was 62 years of age and for 20 years had been a volunteer fireman in the Coleraine, Minnesota, fire department. During the noon hour of May 9, 1928, he answered a fire alarm, ran as rapidly as he could 350 feet to the fire hall, hurriedly put on his fire fighting equipment, mounted on the rear end of the hose truck, the place usually occupied by him on such occasions, and rode a distance of less than a block. As a part of his customary duties, upon reaching the proper location he dropped off backward from the moving truck, holding one end of the hose for the purpose of snubbing it about the hydrant, while the moving truck continued to run out the hose. In thus leaving the truck he misjudged the speed at which it was going and came down to the pavement stiff-legged, receiving a jar. He felt hurt immediately upon striking the pavement; felt a sudden jerk, his eyes blurred, and his neck snapped down. He was nauseated and dizzy but, with some assistance, made the hydrant connection. He reported his condition to the chief of the fire department and was told to go easy. While at the fire he also assisted in replacing two sections of hose that had burst, working as rapidly as possible. He was at the fire about an hour, then returned to his home, feeling a numbness and weakness and had to support himself against the wall in going upstairs on his way to his rooms over his place of business. He lay down for about half an

hour and, on trying to arise, found that his left side, arm and leg were paralyzed.

During the progress of the trial, the referee stated:

"The testimony clearly shows that when he struck he felt the effects of the jar and felt everything inside of him going down, and he felt as though he had received a blow back of the head and then went over to the hydrant and stooped over and felt an unusual sensation, a sort of dizziness, and after going from the fire he went home, and after lying down for a half hour there was a numbness in the left arm and left leg."

At the time he responded to the fire alarm relator was feeling perfectly normal and he had never before had any trouble such as he described or any indication of it. His wife, later in the afternoon of the day in question, telephoned their family physician living in an adjoining village, and under his instructions gave relator medicine and treatment. The referee found "that the disability sustained by this petitioner on and subsequent to May 9, 1928, was not the result of accident and injury arising out of and in the course of his employment," and on this finding denied compensation. The commission, by a two to one vote, approved and adopted the findings and decision of the referee. A rehearing was denied. A memorandum, written by one of the majority, after stating that the disability was commonly known as apoplexy caused by a ruptured blood vessel in a portion of the brain, states that if such rupture was produced by efforts and circumstances arising out of and in the course of employment, such injury would constitute an accidental injury and entitle the employe to compensation. The writer then states that the question was one of fact as to whether the rupture of the blood vessel was the result of efforts or circumstances involved in the employment of May 9, 1928.

No evidence was offered on behalf of respondents. Their defense is based upon a claimed insufficiency of proof that the accident (the cerebral hemorrhage) occurred during the hour in which plaintiff was engaged in the performance of his duty as a fireman. The relator's contention is that it did then occur.

About eight months before the day in question, Blair had been troubled with a moderately high blood pressure of 185. He was treated therefor occasionally during that number of months, by the physician above referred to, and the blood pressure had been greatly reduced. On April 23, about two weeks prior to the fire, it was down to 156, about normal for a man of relator's age. It was up to 186 at the time the physician examined him on May 16. Relator has been gradually recovering since the accident.

A causal connection between the condition in which relator was found and the happenings on May 9 appear from the testimony of the attending physician. He stated:

"My opinion is that the extra exertion and the excitement, by excitement I don't mean nervousness, but the excitement of the running and hurrying and extra exertion of getting on the truck and then the balancing of himself by hanging onto the hose while the truck was moving and getting off, all that would have a tendency to raise his blood pressure, and the blood pressure being raised could have caused a rupture of a blood vessel, causing a cerebral hemorrhage."

He also testified that such a hemorrhage gradually accumulates up to a breaking point and comes at a period where there is unusual strain, although an attack of apoplexy frequently comes without any traumatic cause.

The physician did state that where there is a small hemorrhage, which this relatively was, it might be hours or days before paralysis would set in after the hemorrhage; that he was of the opinion that this paralysis was in close proximity thereto, but that he could not state exactly what relator was doing at the time it occurred. He however testified that in his opinion the hemorrhage had formed shortly before the paralysis set in and that such paralysis can be traced back to an occurrence generally a matter of minutes before and to exertion like heavy lifting. Respondents' contention seems to be that the cerebral hemorrhage was not proved to have come during the time of relator's fire fighting work. There was a diseased condition—relator was subject to a high blood pressure—and under

the rule in the so-called hernia cases so frequently expressed and continuously adhered to by this court, if the hemorrhage was caused by an acceleration of the existing ailment, the injury complained of is compensable. Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635; Bauman v. Roth Downs Mfg. Co. 177 Minn. 98, 224 N. W. 459; 6 Dunnell, Minn. Dig. (2 ed.) §§ 10396-10397, and cases cited.

We recognize the weight that is to be given to the conclusions reached by the referee who heard the testimony and which were approved by two members of the commission. We are however obliged to agree with the dissenting member. The undisputed evidence cannot be disregarded. O'Leary v. Wangensteen, 175 Minn. 368, 221 N. W. 430; Bauman v. Roth Downs Mfg. Co. 177 Minn. 98, 224 N. W. 459. It will not do to place a literal interpretation upon a statement of the doctor that he could not tell exactly what relator was doing at the time the cerebral hemorrhage occurred. It is only reasonable to interpret the doctor's testimony as meaning that he could not tell the exact or even proximate instant or moment it happened. The record shows that there was no occurrence or time for months prior to the fire at which the accident (the hemorrhage) could have occurred. A determination to a mathematical certainty as to exactly when, during the performance of his duties as a fireman, the hemorrhage took place was not necessary. It would be unreasonable to expect it. Failure in that regard did not leave it a matter of conjecture. The testimony of relator and that of the attending physician (the only witnesses) is decisive of this case. Muetzel v. Muetzel, 169 Minn. 360, 211 N. W. 320, and cases cited.

The cause is remanded with directions to award the compensation given by the statute for such disability as the claimant sustained. An attorney's fee in the sum of $75 is allowed relator.

Reversed and remanded.